UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
P.F. and S.F., individually and on behalf of        :
J.F.,                                               :
                        Plaintiffs-Appellants,      :          15-cv-507 (KBF)
                                                    :
              -v-                                   :          OPINION & ORDER
                                                    :
Board of Education of the Bedford Central           :
School District,                                    :
                        Defendant-Appellee.         :
                                                    :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 25, 2016

KATHERINE B. FORREST, District Judge:

On January 23, 2015, plaintiffs-appellants P.F. and S.F. ("plaintiffs" or "parents") filed this action on behalf of their minor child J.F. ("J.F" or "student") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.  Plaintiffs seek review of the October 15, 2014 administrative decision of State Review Officer ("SRO") Carol H. Hauge that denied tuition reimbursement for the student's attendance at a private school during the 2013-2014 school year. The SRO's decision reversed a July 12, 2014 decision of Impartial Hearing Officer ("IHO") Theresa R. Joyner.

On July 31, 2015, plaintiffs moved for summary judgment.  (ECF No. 7.)  On September 18, 2015, defendant-appellee the Board of Education of the Bedford Central School District ("defendant" or "the District") opposed.  (ECF No. 14.) These motion became fully briefed on October 8, 2015.  On October 22, 2015, the action was transferred from the Hon. Kenneth M. Karas to the undersigned.

For the reasons set forth below, plaintiffs' motion for summary judgment is GRANTED.

I.    BACKGROUND

A.    <u>The Student</u>

J.F., who was nine years old during the 2013-14 school year, has multiple disabilities, including global dyspraxia, severe apraxia of speech, and attention deficit hyperactive disorder (ADHD).  As a result, she is, <u>inter alia</u>, largely nonverbal, unable to control her body movements and suffers from cognitive, motoric, and speech / language delays.  Her lack of muscle control makes it difficult for her to speak and to employ non-verbal communication methods such as pointing. She is also highly distractible.  (Pls.' R. 56.1 Stmt. of Material Facts, ECF No. 13 ("Pls.' 56.1"), ¶¶ 1-2, 5.)

J.F. attended a hospital-based preschool program.  Beginning in kindergarten, she attended a mainstream elementary school within the Bedford Central District ("the District") and was placed in its LEAP I Program.  (<u>Id.</u> ¶ 3.) The District offers LEAP I, LEAP II, and SAIL, the latter of which is for autistic children.  (<u>Id.</u> ¶ 4.)  These are the only programs within the District for elementary school children with severe disabilities.  (Tr. 88).[1]  The LEAP I class has a special education teacher, an instruction assistant, two program aides, and a speech therapist.  (Tr. 31-32, 290.)  The class size is 12:1+2, which means that there are twelve students for every teacher and at least two paraprofessionals.  (Tr. 31-33.)

---

[1]      "Tr." citations refer to pages of the proceedings before the impartial hearing officer.  "DX" citations refer to documentary exhibits provided by the defendant District.

Although LEAP I is intended to be a three-year program, J.F. participated for four years.  (Pl.'s 56.1 ¶ 7.)

When J.F. began LEAP I at age five in the 2009-10 school year, her cognitive abilities and academic functioning were at a 24-month level.  (Tr. 292, DX 21.)  As of May 2013, after participating in LEAP I for four years, J.F. was operating at a pre-kindergarten to kindergarten level.  (Tr. 353.)  J.F.'s parents also engaged private therapists to work with J.F. one-on-one.  (Tr. 621, 787.)  The teachers and administrators in LEAP were aware that the parents engaged these additional services.  (Tr. 164, 228, 274-77, 699-700.)  For the 2013-14 school year, the District's Committee on Special Education ("CSE") recommended that J.F. be placed in LEAP II.

B.    Educational Evaluations

Evaluations of J.F. in 2011, 2012, and April 2013, were used in the creation of her Individualized Education Plans ("IEPs") for the 2012-13 and 2013-14 school years.  (DX 6, 13.)  The IEP for the 2012-13 school year recommended that she remain in the LEAP I program; the IEP for the following school year recommended that she be placed in LEAP II.  Information contained in the underlying evaluations is pertinent to the Court's decision herein and is reviewed below.

A November 2011 evaluation by J.F.'s special education teacher Deneane Carrozza indicated that she was able to correctly point to only 2 of the 26 letters presented to her, was unable to count a row of blocks, was only able to point to her first name but not her last name, address, age, or birthday, but was able to correctly identify most colors.  (DX 60.)  She was able to follow one-step directions, search for

hidden objects, play simple games, use a fork and spoon with little assistance, drink from a cup with both hands and place it back on the table, remove her coat with assistance, and indicate when she needed to use the bathroom.  She was playful and interested in her peers, but her attention would often wander after a few minutes at a task.  (Id.)

J.F. also received a speech / language reevaluation in November 2011 from her speech therapist, Susan Schwartz.  Schwartz reported that J.F. could communicate verbally using only single words and had a sign language vocabulary of approximately 100 words.  The report further indicated that even these signs were often physical approximations due to her poor motor coordination and planning.  Schwartz stated that J.F.'s verbal language was very difficult for unfamiliar listeners to understand.  The report concluded that J.F. could make her basic needs and wants known through words, signs, gestures, and augmentative communication devices, but that she had significant deficits in expressive and receptive language skills and a short attention span.  (DX 66.)

In November 2011, J.F. was also evaluated by her occupational therapist, Margaret B. Barnickel.  Barnickel found that J.F. had difficulty tolerating unexpected light touch and was hypersensitive to auditory and visual stimulation, which often distracted her.  She reported that J.F. was able to maintain an upright posture, could maintain personal space, and had improved body awareness.  J.F. was able to adjust her clothing for bathroom needs most of the time, place school materials in a container, obtain needed materials in class, and take off untied shoes.

The report also found that J.F. did not meet cut-off scores on most physical skills. (DX 68.)

A second evaluation by Ms. Carrozza in April 2012 stated that J.F. had become more familiar with colors, had learned to identify 12 letters, and was working on her counting skills. As of that date, however, J.F. remained unable to trace the first letter of her name due to fine motor skill deficits. (Tr. 304-12.)

C.   The CSE Meetings and Recommended Placement

On March 20, 2013, the CSE convened a meeting with the J.F.'s parents to formulate her IEP for the 2013-14 school year. (DX 11.) At the meeting, the CSE recommended that J.F. be placed in the LEAP II program for the 2013-14 school year. The parents expressed concern about the recommendation. The meeting was adjourned to allow the parents to gain additional information about the LEAP II program. (Tr. 57, 229; DX 11.) J.F.'s parents then personally visited the LEAP II classroom and hired an independent evaluator to both observe J.F. in the LEAP I classroom and to visit and provide an evaluation of the LEAP II classroom. The CSE reconvened on May 10, 2013. At that meeting, the CSE continued to recommend the LEAP II program. Based upon the additional information which they had obtained, J.F.'s parents continued to express concerns with such a placement. (Tr. 70-73, DX 11.)

On July 20, 2013, J.F.'s parents submitted a letter formally and specifically setting forth their concerns with the LEAP II program. The letter indicated that based upon their and various specialists familiarity with J.F. and the evaluations of her skills and limitations, J.F. was not socially or academically ready for LEAP II

for the 2013-14 school year and was unlikely to make progress in the program.  (Tr. 73, 798, 805-06; DX 41.)  The parents enclosed a report from an outside speech pathologist Dr. Soifer, dated April 2, 2013, who had observed that J.F. was not academically, socially, or developmentally ready to meaningfully participate in LEAP II.  (Tr. 741-43, 749, 762-62, 809; DX 59.)  The parents indicated to the CSE that they would consider any other potential program offered by the District, as well as private options.  (DX 41.)

Another CSE meeting occurred on August 21, 2013.  The CSE discussed Dr. Soifer's report, but did not make any changes to the proposed IEP.  (DX 8, 59, 11.) A final meeting took place on September 16, 2013.  In that meeting, the CSE reviewed two additional private reports regarding occupational therapy and speech therapy; those reports did not indicate any materially different findings. Nevertheless, the CSE continued to recommend LEAP II for the 2013-14 school year;  no significant change were made to the IEP as a result of that meeting.  (DX 6)

D.     Rejection of the Placement

Following the provision of statutory notice, J.F.'s parents unilaterally placed her at the Children's Academy for the 2013-14 school year.  The Children's Academy has thirty students attending kindergarten through fourth grade, with an average of six students and three instructors and assistants per class.  (Tr. 624-28.)

E.     Decisions of the IHO and SRO

On October 24, 2013, J.F.'s parents requested a hearing with a designated impartial hearing officer ("IHO").  They alleged that the District failed to offer J.F. a

FAPE for the 2013-14 school year and requested that the District reimburse them for the costs of the Children's Academy.

The IHO's hearing spanned six days from January through April, 2014.  She heard from fifteen witnesses and issued a 54-page decision.  In her decision, the IHO credited the testimony of plaintiffs' witnesses.  The IHO's decision stated that J.F. would not have been able to make educational progress in LEAP II, that J.F.'s IEP did not contain a meaningful statement of her management needs and did not sufficiently address how these needs would be managed in the classroom, and that the IEP goals were inadequate.  (See Jul. 12, 2014 Findings of Fact and Order, Case No. 81285, ("IHO Decision"), at 44-47.)  The IHO determined that the BOE had failed to offer J.F. a FAPE for the 2013-14 school year, and awarded plaintiffs reimbursement for the cost of the Children's Academy tuition.  (See id. at 47-48.)

The BOE appealed the IHO's decision to the New York State Department of Education.  On October 15, 2014, an officer from the State Department of Education found that the IEP was reasonably calculated to meet J.F.'s needs and to provide her with educational benefits for the 2013-14 school year.  (Decision on Application of the Board of Education of the Bedford Central School District, Appeal No. 14-132, ("SRO Decision"), at 23.)  The SRO did not reach the question of whether plaintiffs' unilateral placement of J.F. at the Children's Academy was appropriate or whether equitable considerations precluded an award of tuition reimbursement.  (Id. at 23.)

On January 23, 2015, plaintiffs filed the present action seeking reversal of the SRO's decision.

II.    LEGAL FRAMEWORK

The IDEA requires states receiving federal funds to provide all children with disabilities in the state a FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); see also id. § 1412(a)(1)(A).  A FAPE must be "reasonably calculated to enable the child to receive educational benefits."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted).

The state's DOE must develop an IEP for each disabled child that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  Honig v. Doe, 484 U.S. 305, 311 (1988) (citation omitted); see also 20 U.S.C. § 1414(d)(1)(A).  An IEP is adequate under the IDEA if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (citation and quotation mark omitted).  An IEP is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential."  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (citation and internal quotation marks omitted).  In New

8

York State, the formulation of IEPs is delegated to a local CSE, consisting of school board representatives, educators, clinicians, and parents.  N.Y. Educ. Law § 4402.

Parents may challenge the offered IEP by filing a due process complaint.  See 20 U.S.C. § 1415(b)(6)(A).  The parents may then proceed to a due process hearing before an IHO.  See id. § 1415(f)(1)(A).  The IHO's decision may be appealed by either party to the SRO, who independently reviews the findings and decision rendered by the IHO.  Id. § 1415(g).  While the SRO's decision is considered final, a party aggrieved by that decision may bring an action for relief in state or federal court.  Id. § 1415(i)(1)(B), (2)(A).

The IDEA "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate."  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009).  The Court must conduct a two-part analysis to determine whether a school district has offered to provide a student with a FAPE:  First, the Court asks whether "the State complied with the procedures set forth in the [IDEA]."  M.H., 685 F.3d at 245 (citation and internal quotation marks omitted).  Second, the Court asks whether the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits."  Id. (citation and internal quotation mark omitted).

If the State has failed to comply with the procedural or substantive requirements of the IDEA in a manner that constitutes a denial of a FAPE, then the Court must inquire whether the private schooling obtained by the parents "is

appropriate to the child's needs" and must weigh "equitable considerations relating to the reasonableness of the action taken by the parents." Id. (citations and internal quotation marks omitted).  If the State has denied the student a FAPE, if the private school placement is appropriate, and if the equities favor the parents, then the school district must reimburse the parents for the "expenses that it should have paid all along." Id. at 246 (citation and internal quotation marks omitted).

A.    Procedural Considerations

"[N]ot every procedural error will render an IEP legally inadequate." Id. (citation omitted).  Rather, relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

To be procedurally sound, an IEP must contain: "(1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the child; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with 'nondisabled' peers; (6) the reasons for any alternate assessments; and (7) the start date for recommended services, their duration, and their frequency." M.H., 685 F.3d at 245 (citations omitted).

When developing an IEP, a CSE is required to "review existing evaluation data on the child, including–(i) evaluations and information provided by the parents

of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers." 20 U.S.C. § 1414(c)(1)(A). After reviewing that information, the CSE then determines whether additional data are needed to complete the IEP. Id. § 1414(c)(1)(B). If needed, the CSE should administer an assessment or evaluation. Id. § 1414(c)(2). The CSE is authorized to decide that no further evaluations are needed. Id. § 1414(c)(4). The results of the initial or most recent evaluation of the student and any independent evaluations obtained at public expense must be considered in connection with the development of the IEP. 34 C.F.R. § 300.324; N.Y. Comp. Codes R. & Regs. tit. 8, §§ 200.4(f)(1), 200.5(g)(1)(vi).

    B.    <u>Substantive Considerations</u>

When reviewing substantive compliance, the IDEA provides only for a "basic floor of opportunity . . . consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 201 (1982) (internal quotation marks omitted). An IEP is appropriate if it is "likely to produce progress, not regression" and provides an opportunity for more than mere "trivial advancement." <u>Walczak</u>, 142 F.3d at 130 (internal quotation marks omitted). The IDEA only guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." <u>Id.</u> at 132 (citations and internal quotation marks omitted).

III.    STANDARD OF REVIEW

A motion for summary judgment in an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment [motion]."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)) (internal quotation mark omitted).  The motion triggers review of "a state's compliance with the procedures set forth in [the] IDEA" and whether the challenged individualized education program ("IEP") is "reasonably calculated to enable the child to receive educational benefits."  Id. at 225-26 (quoting Lillbask, 397 F.3d at 83 n.3).  "[B]asing its decision on the preponderance of the evidence, [the Court] shall grant such relief as [it] determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  The review is substantive and considers more than whether a material fact is disputed.

District courts independently review the administrative record and make determinations based on a preponderance of the evidence.  See M.H., 685 F.3d at 240.  However, because the judiciary lacks expertise in educational policy, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206; see also M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000) (holding that courts are expected to give "due weight" to administrative proceedings because they generally lack "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (citations and internal quotation marks omitted)); R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012)

("We must give 'due weight' to the state proceedings, mindful that we lack 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" (citation and internal quotation marks omitted)).  Thus, while IDEA administrative determinations are subject to independent judicial review, both the Supreme Court and the Second Circuit have consistently construed the IDEA to "strictly limit[] judicial review of state administrative decisions."  <u>Grim</u>, 346 F.3d at 380 (citations omitted); <u>see also</u> <u>C.F. v. N.Y. City Dep't of Educ.</u>, 746 F.3d 68, 77 (2d Cir. 2014) ("The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review.'" (quoting <u>M.H.</u>, 685 F.3d at 244)).

When an IHO and SRO reach conflicting conclusions, as here, the Court generally defers to the SRO.  <u>R.E.</u>, 694 F.3d at 189.  The Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  <u>Id.</u>; <u>see also</u> <u>M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.</u>, 725 F.3d 131, 139 (2d Cir. 2013) ("Where an SRO has clearly demonstrated a better command of the record and supported her conclusions through better legal and factual analysis than an IHO, we will have little difficulty deferring to the SRO's opinion." (citation omitted)).  In addition, when the hearing officer had opportunity to see and hear witnesses, his or her credibility determination is accorded deference.  <u>See</u> <u>K.R. ex rel. Matthew R. v. New York City Dep't of Educ.</u>, 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015); <u>J.R. v. Board of Educ. Of City of Rye</u>

School Dist., 345 F. Supp. 2d 386, 399 (S.D.N.Y. 2004); see also M.H., 685 F.3d at
255.

Deference to the SRO's decision "is particularly appropriate when . . . the
state hearing officer's review has been 'thorough and careful.'" R.E., 694 F.3d at
184 (quoting Walczak, 142 F.3d at 129)); see also M.H., 685 F.3d at 244
("Determinations grounded in thorough and logical reasoning should be provided
more deference than decisions that are not." (citation omitted)).  An SRO decision
deserves deference "even where the reviewing authority disagrees with the hearing
officer." Id. at 240 (citation and internal quotation mark omitted).  More deference
is warranted when reviewing "the substantive adequacy of an IEP," the adequacy of
an educational methodology, and records containing the same evidence that was
before the SRO.  Id. at 244. Less deference is warranted in appeals involving an
IEP's procedural validity, objective indications of student progress, and records with
new evidence.  Id.  Deference to a well-reasoned SRO determination merits
particular importance where, as here, the Court's decision rests solely on the
administrative record.  See id. at 241.  Where an SRO has concluded that an IEP
was proper, the burden of demonstrating that the SRO erred falls on the plaintiff.
Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 219 (2d Cir. 2014).

IV.    DISCUSSION

Plaintiffs seek reversal of the SRO's decision on four principal grounds.
First, plaintiffs argue that J.F.'s 2013-14 IEP and placement in LEAP II was
"predetermined" in advance of the CSE meetings, and the SRO inappropriately

assumed that the fact that J.F.'s parents' strenuously objected and voiced such objections meant that they had been provided an opportunity for meaningful participation.  Second, plaintiffs argue that the SRO disregarded testimony and evidence that the IEP was inadequate because it did not contain a meaningful statement of management needs and because it did not provide appropriate annual goals.  Third, plaintiffs contend that the SRO improperly discredited the testimony of independent evaluator Dr. Soifer and improperly overturned the IHO's credibility determinations without reasoned analysis.  Finally, plaintiffs challenge the SRO's legal conclusion that plaintiffs could not contest the adequacy of the LEAP II program before the student was actually placed in the program.

As further detailed below, and with due regard for the expertise of the District and SRO, this Court concludes that defendant did deny J.F. a FAPE by (1) predetermining LEAP II as the placement outcome, thereby violating the IDEA's procedural requirements, (2) proposing a 2013-14 IEP for J.F. that lacked a proper statement of management needs and did not contain proper annual goals, and (3) recommending placement in a classroom setting that did not have the capacity to implement the goals in J.F.'s IEP.

A.    Predetermination

The BOE predetermined the IEP by committing to a LEAP II placement for J.F. regardless of what evidence and reports the parents brought forward, thus depriving plaintiffs of a meaningful opportunity to participate in the meeting.

The IDEA guarantees parents the opportunity "to participate in meetings with respect to the identification, evaluation and educational placement of the

15

child." 20 U.S.C. § 1415(b)(1); see also Rowley, 458 U.S. at 206.  Predetermination

of a student's IEP amounts to a procedural violation of the IDEA "if it deprives the

student's parents of meaningful participation in the IEP process."  B.K. v. New York

City Dep't of Educ., 12 F. Supp. 3d 343, 358 (E.D.N.Y. 2014) (collecting cases).  For

an IEP to be predetermined, the district must "not have an open mind" to consider

alternative programs or services during the meeting.  T.P., 554 F.3d at 253.  Mere

parental disagreement with a school district's IEP and placement recommendation

does not amount to a denial of meaningful participation.  See B.K., 12 F. Supp. 3d at

359.  School districts are permitted to come prepared to the CSE meeting with a

draft IEP—as long as it has not been finalized and the parents are not deprived of

"the opportunity to meaningfully participate in the IEP development process."

M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2), 583 F. Supp.

2d 498, 506 (S.D.N.Y. 2008) (citations omitted); see also Dirocco ex rel. M.D. v. Bd.

of Educ. of Beacon City Sch. Dist., No. 11 Civ. 3897 ER, 2013 WL 25959, at *18

(S.D.N.Y. Jan. 2, 2013).

 Based on the record evidence, it is clear that the District never considered

any alternative to placing J.F. in LEAP II, despite the parents' efforts to bring and

highlight various sources of evidence showing that J.F. did not meaningfully

progress in LEAP I in the first four years and that she lacked the academic and

social skills to successfully transition to LEAP II.  Defendant counters that

professional disagreement is not "predetermination," P.K. v. Bedford Cent. Sch.

Dist., 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008), and that the IDEA's meaningful

participation requirement does not give parents veto power, <u>T.Y. v. New York City</u> <u>Dep't of Educ.</u>, 584 F.3d 412, 420 (2d Cir. 2009).  These arguments are beside the point because here, the problem is not the parents' insistence on a "veto" or "professional disagreement."  Rather, the critical problem is that despite four CSE meetings in which the parents attempted to highlight their concerns with the IEP and the LEAP II program and supported their concerns with evaluations and reports from other professionals, the District made no material changes to the IEP and offered no other options.  Thus, the parents' concerns about the LEAP II classroom setting, while voiced clearly and repeatedly, were not taken into account. Even the SRO acknowledged that the CSE was "<u>committed</u> to the decision to recommend the 12:1+2 special placement—the LEAP II program."  (SRO Op. at 13 (emphasis added).)

The SRO reasons that the parents "actively participated throughout the CSE process and were afforded several opportunities to both provide input and present their concerns" and therefore were provided a "meaningful participation" opportunity under the IDEA.  However, that J.F.'s parents tenaciously <u>attempted</u> to participate, and that they were able to "table" (or adjourn) several CSE meetings to summon additional evidence, does not excuse the CSE's lack of willingness to meaningfully respond to any of their concerns.  Here, they were denied meaningful participation precisely <u>because</u> their presentation of extensive evidence as to numerous problems—such as the inadequacy of the annual goals and criteria, J.F.'s lack of meaningful progress thus far, and Dr. Soifer's conclusion that LEAP II would

not be an environment to stimulate meaningful progress—was ignored.  Therefore, the District's predetermination of LEAP II as the appropriate placement for J.F. constitutes a procedural violation of the IDEA's guarantee of a FAPE.

B.    IEP Inadequacies

Plaintiffs allege that the IEP for the 2013-14 school year did not contain a meaningful statement of J.F.'s management needs or appropriate annual goals. They argue that the while the IHO recognized these deficiencies, the SRO failed to properly address them in reversing the IHO's decision.  The Court agrees.

1.    Statement of management needs

J.F.'s September 13, 2016 IEP for the 2013-14 school year contained the following statement for management needs:  "The student has significant delays and requires a small teacher-student ratio program with minimal distractions in order to academically progress."  (DX 6.)  The Court adopts the IHO's conclusion that this statement of management needs was inadequate because the SRO's review on this issue was not "thorough and careful."  M.H., 685 F.3d at 241 (internal citations omitted).

A statement of management needs must be specified so that teachers can be apprised of "the nature and degree to which environmental factors and human resources or materials are required to enable the student to benefit from instruction."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1 (ww)(3)(i)(d).  The statement of management needs in J.F.'s IEP does not address a number of critical issues relating to J.F.'s management needs in the classroom setting, such as reducing her distractibility and impulsivity and reacting to her sensory needs.  (See

IHO Op. at 43.)  A vague and cursory statement that J.F. should be in a small class size environment with "minimal distractions" is inadequate because it does not inform a teacher or parent of what tools, skills, and resources are necessary to produce an appropriate learning environment for J.F.  It outlines no strategies and synthesizes no parameters to achieve proper management of J.F.'s specific needs.

The SRO's review of this topic is not well-reasoned, and merely attempts to make up for the deficiency by citing to language found in other parts of the IEP. Yet what the SRO calls "direct implementation" recommendations—"teacher prompting, help opening snack or lunch containers, use of visuals, physical assistance, vestibular and proprioceptive input, [and] physical facilitation and prompts," (SRO Op. at 20), are themselves vague and uninformative as to what resources and materials are necessary to create an adequate learning environment. Furthermore, these phrases were not actually listed as implementation recommendations or guides in other portions of the IEP.  Rather, they are phrases that happen to be used in describing J.F.'s behavior and development and goals.[2]

2.  Statement of annual goals

Plaintiffs argue that the annual goals listed in the IEP are not reasonably calculated to produce meaningful progress because they are not purposefully designed to respond to her needs, and their criterial levels are too low.  They argue,

---

[2]       Indeed, certain phrases that the SRO calls "direct implementation" recommendations are used in disparate ways in the IEP.  For example, the IEP describes J.F.'s social development as "Student can appear distractible in the classroom, but responds to classroom interventions such as use of visual and teacher prompts."  (DX 6, at 3 (emphasis added).)  However, it also states, "Student is able to participate in dressing and feeding herself with verbal prompts and minimal physical prompts."  (Id.)  In addition, it states that J.F. needs to be able to take turns in structured activity "with verbal prompt."  (Id.)

inter alia, that the IHO properly evaluated the credibility of witnesses to find that J.F. did not achieve any of her 2012-13 IEP goals, and that the number and mastery criteria for the goals were reduced in order to make it easier for J.F. to meet the goals.  (IHO Op. at 43.)

The IDEA requires that the IEP's annual statement of academic and functional goals must be designed to meet the needs of the student, which result from her documented disabilities.  See 20 U.S.C. 1414(d)(1)(A)(i)(II); 34 C.F.R. 300.320(a)(2)(i).  Here, because the IHO's determination was largely based on her evaluation of the credibility of the witnesses, which the SRO lacked, and because the IHO's analysis was more thorough and supported by record evidence, the Court adopts the IHO's determination that J.F.'s IEP annual goals were not adequate.

In determining that the annual goals were not appropriate, the IHO credited J.F.'s special education teacher Ms. Carrozza's testimony that the number of goals was reduced from 22 in the 2011-12 IEP to 17 in the 2012-13 IEP; in the 2013-14 IEP, there were 19 goals.  (IHO Op. at 43, DX 6.)  Ms. Carrozza testified that the goals were reduced to give the student a great opportunity to meet the goals.  (Tr. 344.)  At no time, however, were J.F.'s goals written for mastery level at 85 or 90 percent.  (Tr. 346.)  She acknowledged that when J.F. meets a goal at 50%, that could result from pure guessing.[3]  (Tr. 345.)  The IHO also credited the testimony of the student's mother, S.F., who stated that Ms. Carrozza had admitted at a parent-

---

[3]     Although Carrozza added that J.F. would be tested multiple times, (Tr. 344), additional evidence in the record supports the shifting mastery-rate goal-setting.  (See Tr. 263 (testimony of Susan Schwartz, speech therapist); Tr. 460 (testimony of Elissa Lebovich-Lesser, school psychologist).)

teacher conference in the 2012-13 school year that J.F. had not successfully met <u>any</u> of her IEP goals for that year. (Tr. 797.) The IHO also credited the independent evaluator Dr. Soifer, who stated that the goals as stated contained too-low criteria levels, were not sufficiently intense, repetitive, and focused, and needed to be broken down into smaller parts. (Tr. 760-61, Ex. 13.) Based on these determinations, the IHO concluded that the goals and program did not meet J.F.'s needs and did not enable her to make progress.

The SRO, on the other hand, only discussed the <u>existence</u> of annual goals in the IEP. Her review is almost entirely a perfunctory regurgitation of the content of the IEP and generic testimony as to J.F.'s needs, and does not contain analysis as to how these goals would <u>meet</u> J.F.'s specific needs.[4] Most importantly, her review also ignores the issues raised by the IHO. (<u>See</u> SRO Op. at 15-17.)

For these reasons, this Court agrees with the IHO that the IEP is not reasonably calculated to produce meaningful progress for J.F.

C.    <u>LEAP II and the IEP Goals</u>

Plaintiffs contend that the SRO committed legal error in concluding that the parents could not use evidence from observations of LEAP II classes to question the appropriateness of a LEAP II placement. This Court agrees. In <u>M.O. v. New York City Dep't of Educ.</u>, 793 F.3d 236, 244 (2d Cir. 2015), the Second Circuit held that School districts do not have "'carte blanche' to assign a child to a school "that cannot satisfy the IEP's requirements." Parents do not need to "send their child to a

---

[4]    The SRO's statement that the annual goals were selected based on a "need-based rationale" is too general to constitute well-reasoned analysis. (<u>See</u> SRO Op. at 17.)

facially deficient placement school prior to challenging that school's capacity to implement their child's IEP," because that would be "antithetical to the IDEA'[s] reimbursement process." Id.

The SRO's conclusion that the parents cannot base their complaint on "a retrospective analysis of how the district would have implemented the student's September 2013 IEP at the assigned public school site," (SRO Op. at 21), is incorrect. Plaintiffs' challenge is exactly of the sort addressed by M.O. It is undisputed that there is only one LEAP II classroom, and that is the precise classroom that the CSE recommended J.F. be placed. The parents and Dr. Soifer, the independent evaluator, visited the LEAP II classroom before the September 2013 IEP was adopted. (See DX 59.) Plaintiffs' substantive concerns about the LEAP II classroom, therefore, are precisely that the LEAP II classroom would not properly implement the IEP's requirements.[5] Although it would be "speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." M.O., 793 F.3d at 244. (internal citation omitted).

The IHO provided a careful and well-reasoned analysis as to why LEAP II lacks the services required by J.F.'s IEP. (See IHO Op. 44-45.) First, the IHO

---

[5]   While in M.O., the Second Circuit found that plaintiffs could not attack the substance of the IEP via attacking the placement setting, 793 F.3d at 244, here, plaintiffs' argument about LEAP II is separate from the argument about the IEP's inadequacies. Plaintiffs argue that the LEAP II classroom would not address J.P.'s special education needs because it was too advanced and would exacerbate problems acknowledged in the IEP.

22

credited Dr. Soifer's conclusion that LEAP II would be too advanced for J.F.  (DX 59.)[6]  Second, J.F.'s mother observed that the LEAP II classroom contained a lot of movement of other students coming from and going to activities, which would distract J.F., whose IEP specifically notes her problems with distractibility.  (Tr. 804-06; DX 6.)  The LEAP II teacher, Ms. Guarnieri, also testified that she could only communicate through sign language through the speech therapist, and she did not have experience working with children with global apraxia, like J.F.  (Tr. 417-18.)  J.F.'s difficulties with verbal communication due to her global apraxia is well-documented; her IEP lists annual goals involving sign language.  (DX 6.)  The SRO does not address any of these issues, and instead provides only a conclusory statement that the record "does not support the conclusion that . . . the district would have deviated from the student's IEP in a material or substantial way." (SRO Op. at 22.)

This Court credits the better-reasoned IHO opinion, which is supported by evaluative evidence, and finds that the placement in LEAP II cannot satisfy the IEP's requirements and therefore is not reasonably calculated to enable J.F.'s educational benefits.

---

[6]     The Court agrees with plaintiffs that Dr. Soifer's mistaken references to a "smart board" instead of a white board and the placement of folders containing students' schedules in the LEAP II classroom were not proper bases to discredit her testimony.  Defendant's sole other argument is that Dr. Soifer never herself treated or provided services to J.F. However, Dr. Soifer observed J.F. in the LEAP I classroom, communicated with her teachers, and reviewed J.F.'s IEP; the SRO also did not specifically discredit any substantive portion of Dr. Soifer's analysis.

     D.    <u>Placement in the Children's Academy</u>

The SRO did not reach the question of whether the Children's Academy was an appropriate unilateral placement, or the question of whether the equitable factors favored an award of tuition reimbursement.  The Court defers to the IHO's well-reasoned findings on these issues.  The IHO reviewed and credited evidence that the Children's Academy was a suitable—and indeed, very effective—environment for J.F.'s educational progress.  She also noted the numerous differences between the Children's Academy and LEAP II.  (IHO Op. 45-47.)  She also concluded that nothing in the record precluded reimbursement on equitable grounds, as the parents cooperated fully with the CSE and provided numerous additional evaluations in an effort to find an adequate placement within the public system.  (IHO Op. 47.)

V.    CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate the motions at ECF No. 7 and to terminate this action.

    SO ORDERED

Dated:    New York, New York
           March 25, 2016

                        _____
                        KATHERINE B. FORREST
                      United States District Judge